Filed 12/23/20  P. v. Lucaci CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E072740 |
| v. | (Super.Ct.No. RIF1701070) |
| CORNEL LUCACI, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Bambi J. Moyer, Judge.

Affirmed in part; reversed in part with directions.

Kevin J. Lindsley, under appointment by the Court of Appeal, for Defendant and

Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, and

Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and

Respondent.

A jury found defendant and appellant Cornel Lucaci guilty of (1) arson of a structure (Pen. Code, § 451, subd. (c))[1]; (2) burglary (§ 459); (3) nine counts of insurance fraud (§ 550, subds. (a)(1)), (a)(5) & (b)(1)); (4) two counts of grand theft (§ 487, subd. (a)); and (5) passing off as true a false lease (§ 470, subd. (d)). The jury found true the allegations that (A) in the arson, defendant used a device designed to accelerate the fire or delay ignition (§ 451.1, subd. (a)(5)); (B) the amount of defendant's theft exceeded $100,000 (§ 1203.045, subd. (a)); and (C) defendant's pattern of criminal conduct resulted in the taking of more than $500,000 (§ 186.11, subd. (a)(2)). The trial court found true the allegation that two of defendant's crimes were committed while he was on bail. (§ 12022.1.) The trial court sentenced defendant to prison for a term of 17 years.

Defendant raises seven issues on appeal. First, defendant contends substantial evidence does not support the finding that four of defendant's crimes (Counts 9 through 12) were prosecuted within the statute of limitations. Second, defendant contends there is a lack of substantial evidence to support his grand theft conviction in Count 8. Third, defendant asserts his grand theft conviction in Count 12 is improper because a more specific insurance fraud statute is applicable to the conduct. Fourth, defendant asserts his conviction for burglary (Count 2) must be reversed because the prosecutor argued that the victim was actually a coconspirator who consented to defendant's entry into the building. Fifth, as alternative arguments, defendant contends the trial court erred by not

---

[1] All subsequent statutory references will be to the Penal Code unless otherwise indicated.

sua sponte instructing the jury on consent as a defense to burglary or that his trial counsel was ineffective for failing to request an instruction on consent. Sixth, defendant contends the trial court erred by ordering victim restitution associated with a loss for which defendant was not convicted. Seventh, defendant asserts the trial court erred by imposing fines and fees without first determining defendant's ability to pay. We reverse in part and affirm in part with directions.

## FACTUAL AND PROCEDURAL HISTORY

### A.     BACKGROUND

Defendant and his business partner, Johnny Borsca, owned companies that cleaned buildings following water or fire damage. The companies included IJF Contractors, Vortex Fire and Water Restoration, South Coast Cleaning, and South Coast Cleaning Construction. "There [were] several variations of either IJF or South Coast."

Defendant had a "magic toilet," which was a defective toilet that he obtained from one of his jobs. Defendant's wife (Wife) overheard a conversation between defendant and Elena Gherman. Gherman complained to defendant that her insurance would not pay for all the water damage to her house. Defendant told Gherman that he would bring the "magic toilet" to Gherman's house so "when the inspector c[a]me; and he would check that toilet [then] he [would] see that the toilet is defective."

### B.     2010:  COUNTS 9—12

In February 2010, defendant and Wife lived in a house in Corona. Around February 22, 2010, Wife was away for the weekend. When Wife returned home, defendant was there, and the house was flooded. In the master bedroom, on the second

3

floor, Wife saw a hose coming through a sliding balcony door. The hose was pouring water into the house. Wife saw items in the house that had not been there when she left for the weekend. The new items included a china cabinet, dining table, and rugs. The china cabinet belonged to Gherman.

People will sometimes pad insurance claims to obtain more money from an insurance company; they will also add items such as expensive rugs and china cabinets to the list of damaged property in order to raise the amount of the insurance payout. The water damage to the house was so severe that Wife had to move out of the house. Wife did not move in with her brother. However, there was a false lease reflecting Wife and defendant rented a home from Wife's brother at the rate of $3,475 per month.

Defendant had a renter's insurance policy with Stillwater Insurance Company (Stillwater). In February 2010, defendant filed a claim with Stillwater for water damage at his house. Defendant told an adjuster that the house was uninhabitable so he was staying with family. Defendant sent the false lease to Stillwater in support of his assertion that he had moved out of the house. Defendant and Borsca's company, IJF, provided an invoice or an estimate of $75,000 for mitigation work on defendant's house, and that document was given to Stillwater. Stillwater paid over $100,000 for defendant's claim.

As to the 2010 Stillwater claim, the jury found defendant guilty of (A) presenting a false insurance claim (§ 550, subd. (a)(1)) (Count 9); (B) preparing a document in support of a false insurance claim (§ 550, subd. (a)(5)) (Count 10); (C) making a false

4

lease and passing it off as genuine (§ 470, subd. (d)) (Count 11); and (D) grand theft (§ 487, subd. (a)) (Count 12).

C.    2014:  COUNTS 1—4

In 2012, Armen Megerdichian's dental business experienced a significant financial decline.  In May 2013, Megerdichian listed for sale his dental practice and the building in which the practice was located.  Megerdichian owed $315,000 on the building mortgage and $400,000 on a loan to the practice.  By March 2014, there had been two offers from one potential buyer, but no sale.

On March 26, 2014, Borsca and Megerdichian communicated with one another via their cell phones, and Borsca and defendant communicated with one another via their cell phones.  On the night of March 26, 2014, defendant set Megerdichian's building on fire.  It appeared the fire was accelerated by fuel that had been poured onto cardboard boxes in different areas of the building.  The building became engulfed in flames and collapsed.

Megerdichian's building was insured by Liberty Mutual.  As a result of the fire, Liberty Mutual paid $379,479.60 for the loss of the building and personal property.  The policy also allowed $25,000 for debris removal.  Defendant's and Borsca's company, Vortex, was hired for the debris removal.

As to the 2014 arson, the jury found defendant guilty of (A) arson of a structure (§ 451, subd. (c)) (Count 1); (B) burglary (§ 459) (Count 2); (C) causing to be presented a false insurance claim (§ 550, subd. (a)(1)) (Count 3); and (D) causing to be presented a false statement in support of an insurance claim (§ 550, subd. (b)(1)) (Count 4).

5

D.     2015:  COUNTS 5—8

On August 2, 2015, defendant's house flooded.  Defendant said he spent the night at a friend's home and when defendant returned to his house there was "water coming down from his ceilings inside the lower level of the house."  Defendant said a toilet bowl overflowed due to an obstruction in the bowl and a torn flapper in the tank that caused the water to continue running.

Defendant's insurance company was Pacific Specialty Insurance Company (Pacific).  On August 5, 2015, defendant made a claim with Pacific for the water damage at his house.  Approximately two weeks later, defendant hired a public insurance adjuster, Hratch Zuhrae Ghazarian, to assist him with his insurance claim.  Defendant said Diamond Construction performed the mitigation work on defendant's house.  Defendant submitted two bills from Diamond Construction to Ghazarian.  One bill was for $18,000, and the second bill was for $7,000 or $8,000.  Ghazarian questioned the invoices because they lacked a contractor's license number and did not identify the author.  Ghazarian spoke with Stelian Onufrei of Diamond Construction and corrected the problems on the invoice.  Onufrei was one of defendant's business partners.  Ghazarian submitted the invoices to Pacific.

Pacific began investigating defendant's water loss claim in August 2015.  Jay Richard Bobrowsky managed Pacific's anti-fraud program.  In November 2015, Bobrowsky began working on defendant's 2015 flood claim.  Bobrowsky had access to an Insurance Service Office (ISO) database.  Ninety percent of all insurance claims in the United States are included in the ISO database.  If a person has a high number of

6

claims, then that is "an indicator that [a claim] needs to be looked into further." Defendant was involved as a claimant or a contractor in 20 claims that were flagged as suspicious in the ISO database. Due to different names being used, it took time and multiple ISO searches to reveal the 20 different claims involving defendant. Twenty is a high number of suspicious claims. It is also unusual to have multiple floods at the same house. Most people would have one flood in their lifetime.

Wife told Bobrowsky that the water damage "was staged and fraudulent." Wife said there was furniture in the house after the 2015 flood that had not been in the house before the flood. Wife said furniture she did not recognize had also been in the house after the 2010 flood. Wife told Bobrowsky about the hose in the 2010 flood. Bobrowsky spoke to Mike Mihaila. Mihaila is married to Wife's sister and has known defendant for several decades. Mihaila told Brobrowsky that defendant had been committing insurance fraud "for years and years and was very brazen about it."

In December 2015, Pacific requested that defendant submit to an examination under oath in order to evaluate defendant's claim. The examination occurred in March 2016. During the examination, defendant said Diamond Construction did not perform the mitigation work on his house; rather, defendant performed the work with the assistance of day laborers. Defendant also said that he and Onufrei agreed to share the insurance money. Pacific denied defendant's claim due to fraud.

As to the 2015 Pacific water loss claim, the jury found defendant guilty of (A) presenting a false insurance claim (§ 550, subd. (a)(1)) (Count 5); (B) two counts of

7

allowing a document to be presented in support of a false insurance claim (§ 550, subd. (a)(5)) (Counts 6 & 7); and (C) grand theft (§ 487, subd. (a)) (Count 8).

### E.   ARSON INVESTIGATION

Xente Baker is a fire investigator for the Corona Fire Department.  Baker investigated the 2014 fire at Megerdichian's building.  As part of the investigation, Baker looked for "a history of fraud or fire insurance losses."  By searching the ISO database, Baker found defendant's 2010 water loss claim with Stillwater.  In August 2015, Baker contacted Stillwater, requested the 2010 claim file, and told Stillwater the 2010 claim may have been fraudulent.  Prior to Baker's call, Stillwater did not suspect that defendant's 2010 water loss claim was fraudulent.  In 2015, after receiving inquiries into defendant's 2010 water loss claim, Stillwater assigned an investigator to defendant's 2010 water loss claim.

On March 24, 2017, the Riverside County District Attorney's Office filed a felony complaint against defendant in case No. RIF1701070.  The complaint pertained to the March 2014 arson.  Defendant was released on bail on March 29, 2017.

### F.   2017:  COUNTS 13—14

In April 2017, defendant made a water loss claim with Mercury Insurance (Mercury).  Defendant claimed a supply line ruptured and sprayed water causing damage to his kitchen cabinets.  Robert Kephart, a property claims adjuster for Mercury, went to defendant's house to inspect the damage.  Kephart observed "very, very minimal damage" to the cabinets.  He did not see any damage to the floor. Defendant told Kephart "that he felt the whole kitchen might need to be replaced."

8

After the inspection, defendant told Kephart that he pulled out the dishwasher and saw more damage underneath the cabinets. Kephart went back to defendant's house on April 10 for a second inspection. During the second inspection, defendant said there had been an inch of hot water covering the kitchen floor, which caused the tile floor to lose its sheen. Defendant also said all the cabinets needed to be replaced, and the cabinets cost $45,000. The story of one inch of hot water covering the floor was different than the story that defendant originally told Kephart. William Wheeler, a project manager for RonDell Restoration, accompanied Kephart on the second inspection. Wheeler estimated it would cost $4,500 to repair the damage.

Mark Di Lauro was a special investigator for Mercury. Di Lauro investigated defendant's April 2017 water loss claim. Di Lauro gave the allegedly malfunctioning supply line to a forensic engineer. The engineer examines parts through a high-powered microscope to determine where parts may have failed. The engineer tested the supply line under different water pressure levels from 20 PSI to 80 PSI. The engineer found no leaks or defects in the supply line. Di Lauro then gave the engineer the faucet from defendant's house so the engineer could "look at the whole unit as one." The supply line and faucet did not leak.

Di Lauro found that the damage in defendant's house did not match the story of an inch of water on the ground. If an inch of water had been on the ground then one would expect to see swollen cabinet supports and "a lot of damage," including damage to furniture, such as table and chair legs. Di Lauro concluded defendant's 2017 claim was fraudulent. Mercury denied defendant's claim.

9

As to the 2017 Mercury water loss claim, the jury found defendant guilty of (A) presenting a false insurance claim (§ 550, subd. (a)(1)) (Count 13); and (B) presenting a false statement in support of an insurance claim (§ 550, subd. (b)(1)) (Count 14).

G.    JUNE 2017 CHARGES

On June 9, 2017, the Riverside County District Attorney filed felony charges against defendant in case No. RIF1702029.  The charges pertained to the 2010 water loss claim involving Stillwater, the 2015 water loss claim involving Pacific, and the 2017 water loss claim involving Mercury.  In the complaint, the district attorney alleged that the 2010 Stillwater fraud was not discovered by Stillwater "until after August 7, 2015, when Corona Fire Investigator Xente Baker discovered the offense while conducting follow up on an investigation related to arson of a dental building."  The two cases (RIF1701070 & RIF1702029) were consolidated in November 2017.[2]

## DISCUSSION

A.    STATUTE OF LIMITATIONS

Defendant contends substantial evidence does not support the jury's finding that the 2010 Stillwater charges (Counts 9-12) were prosecuted within the statute of limitations.

---

[2] Defendant requests we take judicial notice of the felony complaint filed on June 9, 2017, in case No. RIF1702029.  (Evid. Code, § 452, subd. (d)(1).)  We deny the request because the complaint is included in a supplemental clerk's transcript.

"When an issue involving the statute of limitations has been tried, we review the record to determine whether substantial evidence supports the findings of the trier of fact. . . . [T]he prosecution has the burden of proving the criminal action was commenced within the applicable limitations period, its burden of proof is by a preponderance of the evidence." (*People v. Castillo* (2008) 168 Cal.App.4th 364, 369.) The statute of limitations for grand theft, a false lease, and insurance fraud is four years after discovery of the commission of the offense, or within four years after the completion of the offense, whichever is later. (§§ 801.5, 803, subd. (c)(1)&(6); see also *People v. Soni* (2005) 134 Cal.App.4th 1510, 1517["a four-year term for all fraud-type felonies"].) Prosecution for a felony charge commences when a defendant is arraigned on the complaint. (§ 804, subd. (c).)

In regard to delayed discovery, the statutory language appears to describe the actual discovery of the crime as the starting point for the statute of limitations, but common law has long held that the statute of limitations " 'commences to run . . . after one has knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud, thus putting him on inquiry.' " (*People v. Zamora* (1976) 18 Cal.3d 538, 561-562.) That means the prosecution must demonstrate "(1) when and how the facts concerning the fraud became known . . . ; (2) lack of knowledge prior to that time; [and] (3) that [there were] no means of knowledge or notice which followed by inquiry would have shown at an earlier date the circumstances upon which the [charge] is founded." (*Id.* at p. 562.)

11

In 2010, Stillwater did not know that defendant's water loss claim was fraudulent. In June and August 2015, Mihaila (Wife's sister's husband) called Baker, who was investigating the 2014 fire at Megerdichian's building. Mihalia told Baker that defendant told Mihalia "he barely had time to run out of the building and shut the door before it blew up in his face." As a result of speaking with Mihalia, in August 2015 Baker began investigating prior insurance claims by defendant. Baker discovered the 2015 claim with Pacific and then the 2010 claim with Stillwater. Baker contacted Stillwater to request the 2010 claim file, and Baker told Stillwater that defendant's 2010 claim may have been fraudulent. Until 2015, Stillwater did not know defendant's 2010 claim may have been fraudulent. The foregoing evidence supports a finding that it was 2015 when Stillwater and law enforcement gained knowledge of defendant's criminal conduct in connection with the 2010 Stillwater water loss claim.

Defendant asserts there was evidence, in 2010, that put Stillwater on notice that defendant's claim was fraudulent. Defendant points to evidence that (1) IJF's estimate to remediate the damage at defendant's house was for a Category 3 water loss involving black water/sewage, and there was nothing to support the assertion that the flood involved black water; (2) Stillwater's adjustors thought defendant's claimed losses were excessive, such as $35,859.80 to clean knick-knacks and figurines; and (3) Stillwater thought defendant was asking too much for living expenses, such as food. Defendant asserts Stillwater "should have conducted an ISO search" to discover defendant's fraud. In other words, defendant asserts Stillwater was aware of facts sufficient to make a reasonably prudent person suspicious of fraud, thus putting Stillwater on inquiry.

12

Under the substantial evidence standard, we must look at the evidence in the light most favorable to the jury's finding. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) In 2010, Stillwater thought IJF's estimate was too high so it obtained an independent estimate of the cleaning costs. IJF's estimate was $75,793.45. The independent estimate was $39,662.79. Stillwater paid defendant based upon the independent estimate—not the IJF estimate. A trier of fact could conclude from this evidence that a reasonably prudent person would not suspect fraud because an independent third party estimated the cleaning costs and while IJF's estimate was high, there was still $39,662.79 worth of cleaning to be done. A reasonably prudent person could conclude that defendant was seeking a more thorough cleaning than necessary or more food costs than necessary, but that some cleaning and food costs were necessary. Because it appeared that there was $39,662.79 worth of damage, a reasonably prudent person would not have been suspicious of criminal activity.

In the light of hindsight, with the knowledge of the arson, 2015 water loss claim, and 2017 water loss claim, one can now see the warning signs of criminal activity in the 2010 water loss claim. However, in 2010, Stillwater had a third party's estimate of $39,662.79 of work that needed to be done at defendant's home. A reasonably prudent person would not look at that information and conclude a fraud inquiry was necessary. Therefore, the four-year clock began running in 2015.

On July 5, 2017, defendant was arraigned on the complaint involving the 2010 Stillwater charges, which is approximately two years after discovery of the commission of the offense. Thus, substantial evidence supports the jury's finding that the

13

prosecution for Counts 9 through 12 commenced within the four-year statute of limitations.

B.    COUNT 8

1.    *PROCEDURAL HISTORY*

Count 8 concerns grand theft in connection with the 2015 Pacific water loss claim. Pacific denied defendant's claim. Pacific spent $22,632 on its own investigation into defendant's claim. In the trial court, the parties and the court discussed whether the jury should be instructed on attempted grand theft as a lesser included offense for Count 8. Ultimately, the jury was not given that instruction.

During closing argument, the prosecutor argued, "Then we have grand theft. So what we have with grand theft specifically has to do with this number here, the $18,000. That was ultimately not paid out. But what we do have was Jay Bobrowsky testifying that they paid out approximately $25,000 to various companies to try to fight this until they realized it was fraud."

2.    *ANALYSIS*

Defendant contends substantial evidence does not support his grand theft conviction for the 2015 Pacific water loss claim because Pacific denied the claim. Defendant asserts that money spent by Pacific on its own investigation of the claim is insufficient for theft. The People concede defendant is correct and assert defendant's Count 8 conviction should be reduced to attempted grand theft. Defendant agrees that his conviction should be reduced to attempted grand theft.

14

"A theft conviction on the theory of false pretenses requires proof that (1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation." (*People v. Wooten* (1996) 44 Cal.App.4th 1834, 1842.) In the instant case, Pacific did not rely upon defendant's representation. Rather, Pacific suspected defendant's representation was false and spent money to prove defendant's representation was false. Therefore, substantial evidence does not support a finding that Pacific relied on defendant's representation.

"Attempt consists of (1) a specific intent to commit a crime and (2) a direct but ineffectual act done toward its commission." (*People v. Marquez* (2007) 152 Cal.App.4th 1064, 1067.) For grand theft, the jury was instructed that, in order to find defendant guilty, defendant must have "knowingly and intentionally deceived a property owner" and that "defendant did so intending to persuade the owner or the owner's agent to let the defendant or another person take possession and ownership of the property."

In finding defendant guilty of grand theft, the jury found defendant intended to defraud Pacific and deprive Pacific of its property. Defendant's intent to defraud and deprive equates with a specific intent to commit a crime in that it shows defendant intended to use false pretenses to take Pacific's property. By submitting the false claim to Pacific, defendant took a direct but ineffectual act toward commission of the crime. Accordingly, we will reduce defendant's conviction in Count 8 to attempted grand theft. (*People v. Vargas* (2002) 96 Cal.App.4th 456, 463 [carjacking reduced to attempted carjacking].)

C.    COUNT 12

As to the 2010 Stillwater claim, the jury found defendant guilty of presenting a false insurance claim (§ 550, subd. (a)(1)) (Count 9) and grand theft (§ 487, subd. (a)) (Count 12). Defendant contends that Count 9 and Count 12 concern the same conduct, and grand theft (Count 12) is more general than insurance fraud (Count 9), so the Count 12 grand theft conviction must be reversed.

"Defendant's challenge is premised on a doctrine often referred to as the *Williamson* rule, based on [the] decision in *In re Williamson* (1954) 43 Cal.2d 651, 6541[] (*Williamson*). Under the *Williamson* rule, if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that conduct to be prosecuted exclusively under the special statute. In effect, the special statute is interpreted as creating an exception to the general statute for conduct that otherwise could be prosecuted under either statute." (*People v. Murphy* (2011) 52 Cal.4th 81, 86 (*Murphy*).)

"Absent some indication of legislative intent to the contrary, the *Williamson* rule applies when (1) 'each element of the general statute corresponds to an element on the face of the special statute' or (2) when 'it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute.' " (*Murphy*, *supra*, 52 Cal.4th at p. 86.) "On the other hand, if the more general statute contains an element that is not contained in the special statute and that element would not commonly occur in the context of a violation of the special statute, we do not assume that the Legislature intended to preclude prosecution under the

general statute.  In such situations, because the general statute contemplates more culpable conduct, it is reasonable to infer that the Legislature intended to punish such conduct more severely."  (*Id.* at p. 87.)

"However, that the general statute contains an element not within the special statute does not necessarily mean that the *Williamson* rule does not apply.  'It is not correct to assume that the [*Williamson*] rule is inapplicable whenever the general statute contains an element not found within the four corners of the "special" law.  Rather, the courts must consider the *context* in which the statutes are placed.  If it appears from the entire context that a violation of the "special" statute will necessarily or commonly result in a violation of the "general" statute, the *Williamson* rule may apply even though the elements of the general statute are not mirrored on the face of the special statute.' "  (*Murphy*, *supra*, 52 Cal.4th at p. 87.)  We apply the de novo standard of review to this issue of statutory interpretation.  (*People v. Prunty* (2015) 62 Cal.4th 59, 71.)

"Included in the statutory crime of grand theft is the offense of obtaining property by false pretenses. . . .  To support a conviction of theft for obtaining property by false pretenses, it must be shown:  (1) that the defendant made a false pretense or representation, (2) that the representation was made with intent to defraud the owner of his property, and (3) that the owner was in fact defrauded in that he parted with his property in reliance upon the representation."  (*People v. Gibson* (1969) 275 Cal.App.2d 198, 200.)

"The elements generally necessary to find a violation of Penal Code section 550 are (1) the defendant's knowing presentation of a false claim, (2) with the intent to

defraud." (*People ex rel. Government Employees Ins. Co. v. Cruz* (2016) 244 Cal.App.4th 1184, 1193.) The crime " 'is complete when a false claim for payment of loss is presented to an insurance company or a false writing is prepared or presented with intent to use it in connection with such a claim whether or not anything of value is taken or received.' [Citation.] 'It is not necessary that anyone actually be defrauded or actually suffer a financial, legal, or property loss as a result of the defendant's acts.' " (*Id.* at pp. 1193-1194.)

We examine whether each element of the grand theft statute corresponds to an element of the insurance fraud statute. Grand theft by false pretenses requires that the victim be defrauded resulting in the victim's loss of property. Insurance fraud does not require the victim to believe the defendant's deception and does not require a loss of property. Therefore, each element of grand theft does not correspond to an element of insurance fraud.

Next, we examine the statutory context to determine whether insurance fraud will either necessarily or commonly result in grand theft. "Statutory context" refers to the idea that statutes are not construed in isolation and that " 'provisions relating to the same subject matter must be harmonized to the extent possible.' " (*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 280; see also *People v. Morrison* (2019) 34 Cal.App.5th 980, 989.) In other words, "[c]onsideration must be given to the entire context surrounding the 'special' statute to determine the true overlap of the statutes and to ascertain the intent of the Legislature." (*People v. Jenkins* (1980) 28 Cal.3d 494, 503.)

18

Insurance fraud is concerned with the act of fraud. It is not concerned with whether the fraud succeeds. (*People v. Zanoletti* (2009) 173 Cal.App.4th 547, 560.) Thus, the insurance fraud statute applies to "completed, as well as attempted, . . . fraud." (*People v. Ruster* (1976) 16 Cal.3d 690, 696 [disapproved of on another point in *People v. Jenkins*, *supra*, 28 Cal.3d at p. 503, fn. 9.) That means the crime of insurance fraud is always applicable when a person makes a false claim to an insurance company, whether the insurance company pays or denies the claim. If the person's false claim results in the insurance company paying more than $950, then the crime of insurance fraud overlaps with grand theft.

Thus, the difference between insurance fraud and grand theft is not any additional culpable act by defendant, but an additional act by the victim. For example, in the instant case, defendant was charged with insurance fraud for making a false claim, and he was charged with grand theft because Stillwater paid the claim. Defendant did not commit any additional acts—Stillwater did. The prosecutor's closing argument highlights this point. The prosecutor argued, "From 2010 you have two counts of insurance fraud, an (a)(1) and an (a)(5). . . . And you have another count, the 487 for the money that was paid out there." As the prosecutor argued, the act that supported the grand theft charge was Stillwater's act of paying the false claim.

People committing insurance fraud are likely to succeed a certain amount of the time, as defendant did. That means when people commit insurance fraud, payment by defrauded insurance companies will be something that commonly occurs. Accordingly, a violation of the insurance fraud statute will commonly result in a violation of the

grand theft statute. In terms of statutory context and harmonizing the two statutes that will commonly overlap, we infer that the Legislature meant for the insurance fraud statute to address acts of fraud in which an insurance company is the victim, so that the two statutes will address separate situations. In other words, the insurance fraud statute (§ 550) precludes prosecution under the grand theft statute (§ 487) when there has been theft from an insurance company via a false insurance claim. (See *People v. Ruster*, *supra*, 16 Cal.3d at p. 697 [unemployment insurance fraud statute precludes prosecution under theft statute].)

The People contend insurance fraud does not commonly result in grand theft because insurance companies deny claims when they discover fraud, as shown in the instant case. Every time a person succeeds at defrauding an insurance company of more than $950, as defendant did in Count 12, the grand theft and insurance fraud statutes will overlap. Given that successful completion of insurance fraud is the only thing separating the two statutes, we are not persuaded that overlap is uncommon.

The People contend defendant forfeited this issue by failing to raise it in the trial court. Defendant was charged with insurance fraud and grand theft for the same act of fraud. If this issue had been raised in the trial court, then the issue would have been the same as it is in this court: defendant arguing that insurance fraud is the specific statute and grand theft is the general statute so prosecution under grand theft is precluded by the insurance fraud statute. The People assert that if defendant had raised the issue in the trial court, then the prosecutor could have amended the information. The People fail to explain in what manner the second amended information could have been amended.

20

The People were already prosecuting defendant for his deception under the insurance fraud statute, so it is unclear what other charge(s) the prosecutor would have added for that same conduct. (See *People v. Woods* (1986) 177 Cal.App.3d 327, 334 [the charge under the general statute was superfluous].) In sum, because it appears this issue would be addressed in the same manner in either the trial court or this court, we conclude the matter was not forfeited. (See *People v. Henry* (2018) 28 Cal.App.5th 786, 791, fn. 3 [addressing a *Williamson* rule issue that was not raised in the trial court].)

D.    BURGLARY

1.    *PROCEDURAL HISTORY*

a.    Prosecutor's Closing Argument

During closing argument, the prosecutor said, "Dr. Megerdichian needs to separate himself from the actual fire and the actual water loss. It would be very suspicious if he is causing all of these losses allegedly by accident, so he gets other people to do it for him. We also have text messages linking Megerdichian to [defendant] through Borsca." The prosecutor continued, arguing, "Burglary. All you need to show, entered a building, and when the defendant entered he intended to commit the felony. That's the arson. If you find the defendant guilty of arson, the burglary just basically follows along naturally."

b.    Defense Counsel's Closing Argument

During defense counsel's closing argument, he asserted, "My theory of the case from the first time I read it was they set up [defendant] for this fire." Defense counsel argued, "But [defendant], he is not responsible for Mr. Borsca and Dr. Megerdichian

21

and what they're doing.  He's not responsible for what they're—they—you know, they are conspiring to burn down the building.  There was no evidence presented that [defendant] was involved in any kind of agreement with Mr. Borsca or . . . Dr. Megerdichian, to burn down the building.  There was no evidence presented to you of that.  There was no text messages or phone calls or nothing like that.  You can't just speculate that that happened.  You have to—they have to show proof beyond a reasonable doubt that that happened."

Defense counsel continued, "The doctor is going to get the insurance policy for the burnt building, and Mr. Borsca is going to get money.  He said he is going to help him do work on the building.  But [defendant] is not a contractor here.  He is not involved with the doctor.  The doctor doesn't even know him.  And the insurance people said, yeah, we haven't even heard [defendant's] name.  [¶]  So where is the evidence of a conspiracy? Did you guys hear anything? There was none presented."

### c.  Prosecutor's Rebuttal Closing Argument

In rebuttal, the prosecutor argued, "The defendant was set up, we're going to talk about that one . . . .  Evidence of an agreement or evidence of the conspiracy, which seems to be the bulk of the defense argument.  . . .  [¶]  We're never going to have an agreement written out and signed notarized by all the parties.  That [is] why the conspiracy law is what it is, so you look at the actions of the parties and determine is that evidence from those actions of an intent of them to come together?"

## 2. ANALYSIS

### a. Prosecutor's Theory

Defendant contends his conviction for burglary must be reversed because the prosecutor argued a legally incorrect theory, i.e., Megerdichian consented to defendant's burglary.

"[T]he Legislature has preserved the concept that burglary law is designed to protect a possessory right in property." (*People v. Gauze* (1975) 15 Cal.3d 709, 713.) Therefore, "[a] burglary remains an entry which invades a possessory right in a building. And it still must be committed by a person who has no right to be in the building." (*Id.* at p. 714.) "Section 459, in short, is aimed at the danger caused by [an] unauthorized entry." (*Id.* at p. 715.)

In regard to inadequate legal theories, "[j]urors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question . . . fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error." (*Griffin v. U.S.* (1991) 502 U.S. 46, 59.) In "a case where the inadequate theory 'fails to come within the statutory definition of the crime' " (*People v. Guiton* (1993) 4 Cal.4th 1116, 1128), "reversal generally is required unless 'it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory' " (*People v. Perez* (2005) 35 Cal.4th 1219, 1233).

The prosecutor's theory of the case was that Megerdichian, Borsca, and defendant conspired in the arson and insurance fraud. Thus, defendant had Megerdichian's permission to enter the building and burn it. Because burglary "must be committed by a person who has no right to be in the building" (*People v. Gauze*, *supra*, 15 Cal.3d at p. 714), the prosecutor's theory did not meet the statutory definition of burglary. (See *Id.* at p. 715 ["Section 459, in short, is aimed at the danger caused by the unauthorized entry itself."].) There is no indication that the jury relied on another theory in convicting defendant of the burglary. Therefore, we conclude defendant's burglary conviction must be reversed.

The People contend consent is a defense to burglary—not an element of the offense. The People assert it was not the prosecutor's burden to establish a lack of consent, and therefore, defendant was convicted on a legally valid theory.

"According to statute, a person is guilty of burglary if he or she enters a building or other structure listed in the statute with intent to commit grand or petit larceny or any felony. (§ 459.) Based on common law precedent, our Supreme Court has clarified the statutory element of 'entry' by explaining that the crime of burglary involves 'entry that invades a possessory right in a building, and must be committed by someone who has no right to be in the building.' " (*People v. Sherow* (2011) 196 Cal.App.4th 1296, 1308.)

In a burglary case, the issue of consent is a defense because "it is a matter of proof peculiarly within the knowledge of the defendant whether the occupant of the building at issue (1) actively invited the defendant to enter with knowledge of the

24

defendant's felonious intent, and (2) the defendant knew that the occupant was aware of his felonious intent." (*People v. Sherow*, *supra*, 196 Cal.App.4th at p. 1305.) Although consent is a defense, it pertains to the element of "entry" and therefore "is not entirely collateral to the elements of burglary. . . . Indeed, as our Supreme Court has observed, '[l]ack of consent [is] material to burglary because it [is] material to the element of entry.' " (*Id.* at p. 1308.)

In the instant case, while it was not the prosecutor's burden to prove a lack of consent, it was improper for the prosecutor to argue there *was* consent and that defendant should nevertheless be convicted of burglary. In other words, the fact that the prosecutor could have remained silent on the topic of consent does not mean the prosecutor was authorized to actively argue a legally invalid theory of entry/consent. The prosecutor's theory of an arson conspiracy between Megerdichian, Borsca, and defendant cannot support a burglary conviction.

b.      Remaining Consent Arguments

In the alternative, defendant contends his burglary conviction must be reversed because the trial court erred by not sua sponte instructing the jury on the defense of consent. As another alternative, defendant contends his trial counsel was ineffective for failing to request a jury instruction on consent. We have concluded *ante* that defendant's burglary conviction must be reversed due to the prosecutor relying on a legally inadequate theory. Therefore, we will not address the merits of the alternative arguments because they have been rendered moot. (*People v. Gregerson* (2011) 202 Cal.App.4th 306, 321 [an issue is moot when a court cannot provide effective relief].)

25

E.    RESTITUTION

    1.    *PROCEDURAL HISTORY*

The prosecutor presented evidence that, in 2014, prior to the arson, defendant was involved in a water loss claim at Megerdichian's building. Liberty Mutual was the insurance company involved in the water loss claim. Liberty Mutual paid the claim. Defendant was not charged with any crimes related to the 2014 Liberty Mutual water loss claim. The trial court allowed the evidence to be presented because it was probative of a pattern of conduct. (Evid. Code, § 1101, subd. (b).)

In the second amended information, the prosecutor wrote, "It is further alleged that . . . defendant . . . committed two or more related felonies, a material element of which was fraud or embezzlement, which involved a pattern of related felony conduct, and this pattern of related felony conduct involved the taking of more than five hundred thousand dollars ($500,000) within the meaning of Penal Code section 186.11, subdivision (a)(2)."

The jury instruction for the section 186.11 enhancement provided, in part, "If you find the defendant guilty of the crime charged in Counts 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 or 14, you must decide whether the People have proved the additional allegation that the defendant engaged in a pattern of related felony conduct that resulted in the loss by another person or entity of more than $500,000. . . . [¶] A *pattern of related felony conduct* means engaging in at least two felonies that have the same or similar purpose, result, principals, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics, and that are not isolated events."

26

During closing argument, the prosecutor told the jury that the evidence of the 2014 Liberty Mutual water loss had been presented "because it shows who our players are. This is how we know that they're working together." In regard to the section 186.11 enhancement, the prosecutor argued, "The white-collar crime enhancement, this kind of comes at the end of the case. It's not kind of attached to any particular count. If you find the defendant guilty of two or more felonies where fraud or embezzlement is an element, a material element—and the instructions say this and common sense will tell you that fraud is a material element of insurance fraud and theft. So that element is met if you find the defendant guilty of those types of counts." The prosecutor continued, "So the easiest way to get to this enhancement, although there's more, is the arson insurance claim, that's fraudulent, and the loss to Liberty Mutual was over 500,000 I believe on its own, and then on top of that you have the 2010 claim for another hundred thousand. So we're well over 500,000."

The jury's verdict for the section 186.11 enhancement reads, "We the jury in the above-entitled action, find it to be true the defendant, CORNEL LUCACI, committed two or more related felonies, a material element of which was fraud or embezzlement, which involved a pattern of related felony conduct, and this pattern of related felony conduct involved taking of more than five hundred thousand dollars ($500,000), within the meaning of Penal Code section 186.11, subdivision (a), subsection (2)."

At the sentencing hearing, the following exchange took place:

The Court: "One question I did have regarding Liberty Mutual. I did not know whether or not there was going to be any disagreement regarding the amounts related back to the water loss.

"[Prosecutor]: My understanding is that there is not but I will throw that to Defense.

"The Court: Mr. Carnero.

"[Defense Counsel]: I submit, Your Honor.

"The Court: Okay. So I'm guessing there's no opposition there.

"[Prosecutor]: No. My understanding is that because of the terms of the 186.11, it includes both charged and uncharged conduct that's related, which is why my understanding is there was submission by the Defense on that.

"The Court: Okay. I wasn't sure if there was going to be an issue there that the Defense wanted to raise. It appears there is not. So I just wanted to make sure we got that on the record."

When the trial court made its victim restitution order, it ordered defendant to pay "restitution to Liberty Mutual Insurance Company regarding the water loss at $194,223.34 and as to the fire loss at $584,766.12 for a total of $778,989.46."

  2. *ANALYSIS*

Defendant contends the trial court erred by ordering victim restitution for a loss for which defendant was not convicted.

Victim restitution is authorized for "a victim of crime who incurs an economic loss as a result of the commission of a crime." (§ 1202.4, subd. (a)(1).) In the instant

28

case, because defendant was not convicted of any crime associated with the 2014 Liberty Mutual water loss, it cannot be shown that Liberty Mutual incurred an economic loss as a result of the commission of a crime. In other words, without a conviction there is not a crime for which restitution can be ordered. We conclude the trial court erred by ordering defendant to pay $194,223.34 for the 2014 Liberty Mutual water loss.

The People contend the restitution fine was proper because the jury found true the aggravated white-collar enhancement (§ 186.11). The enhancement statute provides, "Any person who commits two or more related felonies, a material element of which is fraud or embezzlement, which involve a pattern of related felony conduct, and the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than one hundred thousand dollars ($100,000), shall be punished, upon conviction of two or more felonies in a single criminal proceeding, in addition and consecutive to the punishment prescribed for the felony offenses of which he or she has been convicted, by an additional term of imprisonment in the state prison as specified in paragraph (2) or (3). . . . For purposes of this section, 'pattern of related felony conduct' means engaging in at least two felonies that have the same or similar purpose, result, principals, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics, and that are not isolated events." (§ 186.11, subd. (a)(1).)

The People point to former subdivision (d) of section 186.11, which provided, "Any person convicted of two or more felonies, as specified in subdivision (a), shall be liable for the costs of restitution to victims of the pattern of fraudulent or unlawful

29

conduct, if the existence of facts that would make the person subject to the aggravated white collar crime enhancement have been admitted or found to be true by the trier of fact." The People assert defendant's pattern of felony conduct included the 2014 Liberty Mutual water loss claim.

A pattern of felony conduct requires felony convictions. (§ 186.11, subd. (a)(1) [" 'pattern of related felony conduct' means engaging in at least two felonies"].) Felonies are found by a trier of fact. "[N]othing in section 186.11, subdivision (d) suggests that post-verdict, the prosecution may seek restitution for losses caused by crimes not included in the pattern of related felony conduct specifically charged in the section 186.11, subdivision (a) allegation, and found true by the jury." (*People v. Lai* (2006) 138 Cal.App.4th 1227, 1250.) "The 'costs of restitution' owed to . . . victims necessarily refers to losses caused by the qualifying felonies that constitute the charged statutory 'pattern,' not losses for *other* felonies neither admitted nor found true." (*Ibid.*)

In the instant case, there is nothing in the second amended information, in the jury instruction, in the prosecutor's closing argument, or in the jury's finding that indicates the jury found the uncharged 2014 Liberty Mutual water loss claim (A) involved a felony, or (B) was part of a pattern of felonious conduct. The only mentions of Liberty Mutual as a victim of the pattern of felonious conduct were in the jury instruction and in the prosecutor's closing argument and those were limited to the arson loss. Because (1) the jury did not find that defendant committed a felony related to the 2014 Liberty Mutual water loss claim, and (2) the jury did not find the 2014

30

Liberty Mutual water loss claim was part of defendant's pattern of related felony conduct, we find the people's reliance on section 186.11 to be unpersuasive.

### F. ABILITY TO PAY

#### 1. *PROCEDURAL HISTORY*

The opinion in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) was filed on January 8, 2019. Defendant's sentencing hearing took place on April 15, 2019. The probation report reflects defendant was born in August 1960, which means he was 58 years old at the time of the sentencing hearing. Defendant has a high school diploma and worked in fire and flood restoration.

At the sentencing hearing, when the prosecutor spoke of defendant's likelihood of reoffending, he said, "He's going to—you know, he has no money. He's got a huge restitution. I mean, there's ample evidence for motive and ability to re-offend." The trial court declined to order defendant to pay the cost of the presentence probation report saying, "[T]he court will find that he has no present ability given the amount of restitution that he otherwise has to pay." The trial court went on to say, "Regarding the booking fee of [$]514.58 under 29550 of the Government Code, that is subject to ability to pay. It is not mandatory on a terminal disposition. The Court will find no present ability to pay that given the other amounts owed in this particular case. Given the extreme amounts that will be owed in victim restitution, which is up near a million dollars, I would prefer that those restitutions be paid off if at all possible. [¶] That also goes for the presentence incarceration cost of [$]1500. The Court will find no present ability to pay those."

31

The court imposed the minimum restitution fine of $300. (Pen. Code, § 1202.4, subd. (b).) The court imposed a $40 per count court operations fee (Pen. Code, § 1465.8), for a total of $560, and a $30 per count court facilities fee (Gov. Code, § 70373), for a total of $420. Defendant's trial counsel asked the trial court to recommend defendant be placed at a fire camp. The trial court denied the request due to defendant's arson conviction.

### 2. ANALYSIS

Defendant contends the trial court erred by (1) imposing the court facilities fee (Gov. Code, § 70373) and the court operations fee (Pen. Code, § 1465.8), and (2) executing the restitution fine (Pen. Code, § 1202.4, subd. (b)) without first determining defendant's ability to pay.

In *Dueñas*, the appellate court concluded that it is a violation of due process to impose a court facilities fee and court operations fee without first determining the defendant has the ability to pay those fees. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) The appellate court also concluded that it violates due process to not stay a restitution fine unless the trial court has first determined the defendant has the ability to pay the fine. (*Ibid.*)

The People contend defendant forfeited this issue by failing to raise it in the trial court. "The concept of forfeiture for failure to raise [the] ability to pay fines, fees or assessments is well established in our caselaw." (*People v. Keene* (2019) 43 Cal.App.5th 861, 864.) If, in the trial court, a defendant fails to raise the issue of an inability to pay, then the defendant has forfeited the argument on appeal. (*People v. Avila* (2009) 46 Cal.4th 680, 729.) The *Dueñas* opinion was filed approximately three

32

months prior to defendant's sentencing hearing. Defendant did not request an ability to pay hearing or object to imposition of the fees and fine. Therefore, defendant forfeited this issue.

Defendant asserts he did not forfeit this issue because the imposition of the fees and fine constitutes an unauthorized sentence. "[A] sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstance in the particular case. Appellate courts are willing to intervene in the first instance because such error is 'clear and correctable' independent of any factual issues presented by the record at sentencing." (*People v. Scott* (1994) 9 Cal.4th 331, 354.)

The fees and fine could lawfully be imposed if defendant has the ability to pay. Because there is a circumstance under which the fees and fine could be lawfully imposed, the sentence is not unauthorized. Thus, in order to establish that the sentence is unauthorized, defendant needed to demonstrate his inability to pay in the trial court. (*People v. Avila*, *supra*, 46 Cal.4th at p. 729.) Because defendant failed to raise the issue in the trial court, his sentence is not unauthorized. Therefore, the issue remains forfeited.

Defendant asserts he did not forfeit this issue because an objection would have been futile. At the time of the sentencing hearing, *Dueñas* had been published for three months, so if defendant lacked an ability to pay, one could expect the trial court would have entertained an objection based on *Dueñas*. Further, the trial court assumed, without an evidentiary hearing, that defendant lacked an ability to pay various fines and fees. Therefore, it appears the trial court would have been open to a *Dueñas* objection if

33

it had been raised. In sum, given that *Dueñas* was published at the time of defendant's sentencing hearing and the trial court assumed defendant lacked an ability to pay some fines and fees, we are not persuaded that an objection based upon *Dueñas* would have been futile.

Defendant contends this court can consider the merits of his forfeited contention because it affects his fundamental constitutional rights. The forfeiture rule extends to "claims based on violations of fundamental constitutional rights." (*In re Seaton* (2004) 34 Cal.4th 193, 198.) Nevertheless, "application of the forfeiture rule is not automatic. [Citations.] But the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.)

In the instant case, defendant asserts his fundamental rights of due process and equal protection were implicated by the imposition of the fees and fine without an ability to pay hearing. However, defendant does not explain how these rights were impacted. Defendant was "not denied access to the courts or prohibited from presenting a defense. [Citations.] [Defendant was] not incarcerated because [he was] unable to pay prior fees, fines or assessments." (*People v. Lowery* (2020) 43 Cal.App.5th 1046, 1056.) Because it is unclear in what manner defendant's fundamental rights were impacted, we are not persuaded that the forfeiture should be excused. (See *Id.* at p. 1059 ["Appellants do not articulate how a fundamental liberty interest was implicated"].)

Defendant asserts that if his trial counsel forfeited the issue, then his trial counsel rendered ineffective assistance. There are two steps to demonstrating ineffective assistance of counsel. "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) As to the first step, " ' "If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' " ' " (*People v. Henderson* (2020) 46 Cal.App.5th 533, 549.)

The record does not indicate why defendant's trial counsel failed to raise the *Dueñas* issue in the trial court. There are possible satisfactory explanations for defense counsel's silence. It is possible defense counsel was hoping for the fire camp recommendation from the trial court and therefore strategically chose to not request a hearing in which counsel would need to portray defendant as a person who would be unable to work and earn an income over a 17-year sentence. (See *People v. Johnson* (2019) 35 Cal.App.5th 134, 139 [ability to pay with prison wages].) It is also possible the trial court was wrong in its assumption that defendant lacked the ability to pay, and therefore it was better for defendant to not have an evidentiary hearing on the issue. Another possibility is that defendant was hiding assets from his prior insurance fraud and did not want prosecutors examining his finances. Based upon this record, the first

prong of the ineffective assistance of counsel issue has not been met. Therefore, the claim of ineffective assistance of counsel fails.

G. <u>CONCLUSION</u>

Pursuant to section 654, the trial court stayed the sentences for Counts 2, 8, and 12. We have concluded *ante* that defendant's Count 8 conviction must be reduced from grand theft to attempted grand theft. We have also concluded that defendant's burglary conviction (Count 2) and grand theft conviction (Count 12) must be reversed. Given that the sentences for those counts were all stayed, it is unlikely that a different sentence would be imposed if the matter were remanded for a full resentencing hearing. (See *People v. Woods*, *supra*, 177 Cal.App.3d at p. 334 [sentence unlikely to change when terms were previously stayed].) Accordingly, we will not direct the trial court to conduct a full resentencing hearing (see *People v. Buycks* (2018) 5 Cal.5th 857, 893 [defining the full resentencing rule]), but we will direct the trial court to resentence defendant on Count 8, given the reduction in the crime (§ 664, subd. (a) [attempt is punishable by one-half the term of imprisonment for the completed offense]).

The trial court will also need to issue documentation reflecting that defendant does not owe $194,223.34 to Liberty Mutual and that defendant now has 12 convictions rather than 14, so the amount of the "per count" fees will need to be reduced accordingly (Pen. Code, § 1465.8; Gov. Code, § 70373).

**DISPOSITION**

The Count 2 burglary (§ 459) conviction is reversed. The Count 12 grand theft (§ 487) conviction is reversed. The order for $194,223.34 in victim restitution for

36

Liberty Mutual is reversed. The Count 8 grand theft conviction is reduced to attempted grand theft (§§ 487, 664). The trial court is directed to resentence defendant on Count 8. The trial court is also directed to issue a minute order reflecting the reduction in defendant's fees (Pen. Code, § 1465.8 & Gov. Code, § 70373) and in the victim restitution owed to Liberty Mutual. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

RAMIREZ
P. J.

FIELDS
J.